# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| **CHRISTOPHER BRECKEEN** | **CASE NO. 6:18-cv-1444** |
| **-vs-** | **JUDGE DRELL** |
| **EDDIE SOILEAU ET AL** | **MAGISTRATE JUDGE DAVID J. AYO** |

## RULING

This case came before the Court by bench trial on the merits on October 20, 2023. Plaintiff, Christopher Breckeen ("Breckeen") appeared *pro se*. Defendants, Evangeline Parish Sheriff Eddie Soileau ("Soileau") and Deputy Evangeline Parish Sheriff Duane Jordan ("Jordan") appeared via counsel, but not in person. Considering the evidence adduced and the arguments of the parties, the Court issues the following ruling:

## I.     BACKGROUND

### A.  UNDERLYING EVENTS

On August 10, 2015, two suspects attempted to steal an ATM from Citizens Bank in Mamou, Louisiana, using a backhoe during the early morning hours (hereinafter "the Heist"). One suspect was clearly identified by a witness as Dejuan Guillory ("Guillory"), a black male. Witnesses at the scene described the second suspect as a white male dressed all in black. The suspects fled the scene on the backhoe and fired an AR-15 at a pursuing officer giving chase. The officer dropped chase after taking fire and the suspects got away. The backhoe was found abandoned some distance away from its original locus with the ATM machine still attached shortly thereafter.

The Mamou Police Department ("Mamou PD"), Louisiana State Police, and Evangeline

1

Parish Sheriff's Office ("EPSO") all participated in the initial investigation. Mamou PD subsequently took the investigative lead.

Later, on August 10, 2015, investigators discovered that the backhoe belonged to a local company and had a GPS tracking device installed. According to the GPS tracking device, the backhoe had stopped "for a period of time" at a property owned by Plaintiff, Christopher Breckeen ("Breckeen") located on Deculus Rd. ("Deculus Property"). Mamou PD obtained a search warrant and discovered that the Deculus Property was vacant.

That same day, Mamou PD officers went to the house of Breckeen's wife, Tracy Lee Brezina ("Brezina"). Breckeen and Brezina were separated and in the middle of a divorce. Brezina advised Mamou PD that Breckeen had not been living at the Deculus Property for a while and was instead staying at a friend's mother's house located on Hickory Street in Mamou, Louisiana ("Hickory House"). She further advised officers that their eldest son had spent the evening with Breckeen at the Hickory House.

Officers then went to the Hickory House where they handcuffed and detained Breckeen and the son of the home's owner, Brandon Arvie ("Arvie"). Mamou PD also questioned Breckeen's seven-year-old son, Landry Breckeen ("Landry"). Breckeen and Arvie were subsequently brought to the police station, placed in separate cells, and individually questioned. Landry, Arvie, and Breckeen all advised officers that the three of them had been home the entire night of August 9, 2015 until the late morning of August 10, 2015. Landry further advised officers that he fell asleep on Breckeen's chest and woke up on Breckeen's chest. Arvie advised officers that his mother had been home that evening as well, but officers did not question Arvie's mother to corroborate Breckeen's whereabouts that evening. Arvie and Breckeen were released from custody the evening of August 10, 2015. Neither was brought back in for questioning.

Mamou PD continued its investigation and received a witness statement on August 12, 2015, that described a backhoe being driven by a possibly white male of medium build on a nearby road between 1:30 a.m. and 1:45 a.m. the morning of August 10, 2015, shortly before the Heist. The backhoe was followed by a silver vehicle with no license plate. The silver vehicle was later found at the home of Guillory, who had also been positively identified by a witness of the Heist.

Breckeen, of his own volition, went back to the Mamou PD to advise that he had been in Guillory's vehicle the day before the Heist and saw an AR-15 in the vehicle, the same type of weapon used to fire at police officers that morning.

Breckeen was not questioned again, Breckeen was not contacted again, no new evidence implicating Breckeen was discovered, and subsequent witness statements did not describe anybody fitting Breckeen's description. The sum total of evidence against Breckeen was that he was white and the backhoe was parked at the vacant Deculus Property for "some period of time." Breckeen had two witnesses attest to his whereabouts the entire evening, a potential third that could have verified his whereabouts, and a fourth that corroborated other parts of his story.

Sometime later, Breckeen moved to Texas. Brezina remained in Mamou, Louisiana.

On February 18, 2016, Brezina apparently got into a fight with her family in Mamou, LA. She threatened them with never seeing her and Breckeen's three kids again and told them that she was going to transfer custody to Breckeen in Texas. Brezina apparently made these threats in front of a family friend that was either in law enforcement or the judicial system. Brezina also alleges other family members were in law enforcement.

The following day, Brezina followed through on her threat and signed a temporary custody agreement transferring custody of her three children to Breckeen. Also on February 19, 2016, Deputy Sheriff Duane Jordan executed an affidavit for arrest containing material

misrepresentations and omissions ("Affidavit"). This Affidavit was used to obtain a warrant for Breckeen's arrest ("Warrant").

Breckeen was subsequently arrested while driving with his children in Texas sometime in November of 2017. He spent eleven (11) days in jail and was released on a $23,000 bond. It is unclear why Breckeen spent eleven days in jail and was released on bond instead of being extradited to Evangeline Parish, but it is clear that EPSO was non-communicative with Texas authorities, with Breckeen, and with Breckeen's mother, Katy Williams ("Williams"), about why there existed a warrant in the first place.

Breckeen hired an attorney in Texas, posted bond via a bondsman, hired an attorney from Lafayette, turned himself in to EPSO, and secured his release.

A bill of information was filed by the Evangeline Parish District Attorney ("EPDA") on December 20, 2017. Breckeen was required to travel from Texas to Evangeline Parish at the behest of the EPDA on at least four separate occasions before the EPDA dropped all charges.

## B. PROCEDURAL BACKGROUND

Breckeen filed suit on November 5, 2018 against EPSO Sheriff Eddie Soileau in his official and personal capacity as well as EPSO Deputy Sheriff Duane Jordan in his official and personal capacity.[1] The complaint alleged violations of 42 U.S.C. § 1983 ("Section 1983") claiming violations of the Fourth Amendment to the U.S. Constitution relating to his false arrest, abuse of process, and malicious prosecution. He also seeks damages pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978).

---

[1] Breckeen was represented by counsel at the time the law suit was filed. Breckeen terminated his attorney and an Order granting his attorney's motion to withdraw was issued on September 10, 2020 (Doc. 22). Breckeen elected to proceed *pro se* from this point forward. The original Complaint was never amended.

A bench trial was held on October 20, 2023. Plaintiff appeared *pro se*. He entered five exhibits into evidence,[2] offered the testimony of four witnesses,[3] and gave his own testimony. The defense rested without putting on any testimony. It did enter three exhibits.[4] Plaintiff did not subpoena any witnesses and neither defendant testified. The named defendants did not bother to attend the trial.

The following evidence was admitted at trial or included in the pretrial stipulations of record.

### i. Exhibits

#### a. Plaintiff's Exhibit 1: September 24, 2015 Mamou PD Supplemental Report ("Supplemental Report")

On August 10, 2015, at about 3:45 a.m., Chief Robert McGee with the Mamou Police Department received a call from dispatch about what was believed to be a bulldozer that ripped an ATM from Citizen's Bank in Mamou and suspects that had fired shots at pursuing officers. The bulldozer turned out to be a backhoe that was abandoned by the fleeing suspects. It belonged to Coastal Bridges, Inc., which had installed a GPS tracker on it. The GPS tracker traced the backhoe to the driveway of Deculus Rd. "for a period of time."

Mamou PD obtained a search warrant for the Deculus Property where they discovered the it abandoned and backhoe tracks "a little ways in the driveway." (Doc. 69, pg. 2). Police later went to the home of Breckeen's then wife, Brezina, to interview her. Brezina told police that Breckeen was staying with Arvie at the Hickory House and that he had Landry the entire evening.

---

[2] Exhibit P1, the supplemental police report of Mamou P.D.; Exhibit P2, the February 19, 2016 arrest warrant issued by the Honorable Chuck West, Judge for the 13the Judicial District for the State of Louisiana; P3, the affidavit for arrest warrant signed by Evangaline Deputy Sheriff Duane Jordan; P4, the witness statement of Ellen Marie Chapman; and P5, the February 19, 2016 temporary guardianship agreement between Plaintiff and his then spouse.
[3] Brandon Arvie, a long-time friend of Plaintiff; Landry Breckeen, Plaintiff's eldest son; Tracy Lee Brezina, Plaintiff's ex-wife; and Katy Williams, Plaintiff's mother.
[4] Exhibit D1, the bill of information filed against Plaintiff; D2, the booking card of Plaintiff; and D3, a creiminal history record check of Plaintiff.

Mamou PD then went to the Hickory House, located Breckeen and Arvie, cuffed them, and brought them to the police station for questioning. According to the Supplemental Report, Arvie and Breckeen were both read their Miranda Rights. This is disputed by the trial testimony of both Arvie and Breckeen. Both Breckeen and Arvie told Mamou PD that they had been at the Hickory House the entire night. According to the trial testimony of Breckeen, Arvie, and Landry, they each told Mamou PD that they had been at the Hickory House the entire night.

Officers later questioned Guillory at his residence. They observed a silver Altima "that had no license plate on it and was full of dust like it was on a gravel road." (Doc. 69-1, pg. 4). This vehicle fit the description of a witness statement claiming to have seen a backhoe travelling on Hwy 1160 towards Mamou between 1:30 and 1:45 a.m. on August 10, 2015. It was followed by a silver or grey car without a license plate. This witness states that she could not observe the driver of the car and provided a nondescript account of the person driving the backhoe stating "[t]he driver of the backhoe turned his head to the right, so I was unable to see his face. He appeared to be a white male, medium built, he was wearing a cap on his head." (Doc. 69-1, pg. 12).

Mamou PD also questioned Guillory's fiancé about the events of that morning. She could not corroborate his alibi and further mentioned that Guillory had come home dirty and sweaty some time in the morning hours.

On August 11, 2015, Mamou PD received the statements of several witnesses to the events at Citizens Bank the day prior. An emergency room nurse stated that she saw a man dressed in all black jump on the backhoe. No further description was given. A juvenile that was present that morning stated that he saw a man dressed all in black jump off of the tractor. Mamou PD also obtained blurry security footage that appears to show two suspects on the backhoe pushing the ATM.

On August 13, 2015, Mamou PD interviewed a security guard who witnessed the ATM theft. He advised that he saw Guillory's face, that Guillory was carrying a sawed off weapon, and that there was a white guy present on the bulldozer, but he could not see the white man's face.

There are no other witness descriptions contained in the Supplemental Report.

### b. Plaintiff's Exhibit 2: February 19, 2016 Arrest Warrant for Christopher Breckeen ("Arrest Warrant")

On February 19, 2016, the Honorable Chuck R. West issued an arrest warrant for Breckeen "upon the sworn affidavit of Duane Jordan, with the EVANGELINE Parish Sheriff's Office" charging Breckeen with one count of theft between $5,000 and $25,000 – a felony offense.

### c. Plaintiff's Exhibit 3: Affidavit for Arrest Warrant Signed by Duane Jordan of the Evangeline Parish Sheriff's Office ("Affidavit")

Jordan executed under oath an affidavit for arrest warrant on February 19, 2016. The Affidavit claimed in pertinent part:

> During the investigation and receipt of written statements, it was learned that a John Deer [sic] rubber tire backhoe was seen driven on the night of August 10, 2015 by a white male subject **fitting the description of a known suspect** in this case by the name of Christopher Brackeen. He was brought it for questioning.
>
> ...
>
> **After further investigations**, it was learned that a John Deer [sic] backhoe belonging to Coastal Bridge Company out of Baton Rouge, LA had been stolen. The backhoe was equipped with a GPS tracking device, in which the logs indicated that the stolen backhoe was stopped at Breckeen's residence of 2282 Deculus Road Mamou, LA for a period of time. (emphasis added)

The Affidavit did not disclose that Breckeen had a corroborated alibi for his whereabouts the evening of August 9, 2015 and early morning hours of August 10, 2015. It falsely suggested that the GPS log information came "[a]fter further investigations" when it was the first information obtained by the police. It further fails to explain how the extremely limited witness descriptions that had been previously received described a subject "fitting the description" of Breckeen.

**d. Plaintiff's Exhibit 4: Witness Statement of Ellen Marie Chapman ("Chapman Statement")**

The witness statement of Ellen Marie Chapmen ("Chapman Statement") is the only witness statement referenced in the Supplemental Report that provides a somewhat meaningful description of any person involved in the Heist other than Guillory. According to the Chapman Statement, she witnessed a backhoe travelling on HWY 1160 between 1:30 a.m. and 1:45 a.m. "The driver of the backhoe turned his head to the right, so I was unable to see his face. He appeared to be a white male, medium built, he was wearing a cap on his head."

**e. Plaintiff's Exhibit 5: February 19, 2016 Temporary Guardianship Agreement ("Guardianship Agreement")**

On February 19, 2016, the same day that the Arrest Affidavit and Arrest Warrant were executed, Breckeen and Brezina, executed a temporary guardianship agreement. At the time, Breckeen and Brezina were married and separated with Breckeen living in San Antonio, Texas and Brezina living in Mamou, Louisiana.

**f. Defendant's Exhibit 1: December 20, 2017 Bill of Information Charging Christopher Breckeen ("Bill of Information")**

On December 20, 2017, the district attorney for the parish of Evangeline filed a bill of information in the 13th Judicial District Court charging Breckeen with theft of more than $5,000 but less than $25,000.

**g. Defendant's Exhibit 2: Waxahachie County, Texas Booking Card for Christopher Breckeen ("Booking Card")**

According to the booking card, Breckeen was released from custody on November 29, 2017.[5] His bond was set at $23,000 and he was bonded out by James Behard.

**h. Defendant's Exhibit 3: Louisiana Criminal Record Report for Christopher Breckeen**

---

[5] The date of release on the booking card does not align with the narrative of this case. Both parties agree that Breckeen was in jail for 11 days.

According to the criminal record report for Breckeen, he has not been arrested for any other alleged offenses other than the one made basis for this case. The criminal history report indicates that Breckeen was 6'00, 195 lbs., and bald at the time of his arrest.

### ii.   *Trial Witness Testimony*

#### a.   Brandon Arvie ("Arvie")

Arvie is a long-time friend of Breckeen. He testified in pertinent part that Breckeen was with him and Breckeen's son Landry at Arvie's mother's home on Hickory St. the evening of August 9, 2015 through the morning of August 10, 2015. Arvie testified that he was detained with Breckeen the early afternoon of August 10, 2015 and advised the Mamou PD that Breckeen had been with him the entire evening. Arvie's testimony in this regard is corroborated by the Supplemental Report. Arvie further testified that Breckeen had been living at Arvie's mother's house for several weeks prior to August 10, 2015 and that Breckeen stayed in a furnished "outdoor kitchen" that did not have a separate shower.

#### b.   Landry Breckeen ("Landry")

Landry is the oldest son of Breckeen. He was 7 years old on August 10, 2015. Landry fell asleep on Breckeen's chest the evening of August 9, 2015 and woke up on Breckeen's chest the morning of August 10, 2015. Landry testified that both Breckeen and Arvie were home the entire evening of the Heist. Breckeen's arrest and detention made him very scared and Breckeen's subsequent battle with Evengeline Parish was stressful on Breckeen, hard on his job, and it forced the family to move in with Breckeen's parents. He testified that the whole ordeal negatively affected the entire family.

#### c.   Tracy Lee Brezina ("Brezina")

Brezina was married to Breckeen for approximately ten years. She was in the middle of a divorce with Breckeen when the ATM robbery took place and when the Warrant and Affidavit were signed. According to Brezina, she executed a temporary custody agreement with Breckeen on February 19, 2016, because the prior day threats were made by her family to take her children away from her. Brezina implies that the Affidavit was executed in retaliation for her entering the temporary custody agreement, but no other evidence is provided.

### d. Katy Willliams ("Williams")

Katy Williams is the mother of Breckeen. She testified regarding her son's state of mind, mental anguish and emotional distress, the impact the arrest had on her son's employment and finances, his educational background playing football for the Air Force Academy, and graduating from Texas A&M – Commerce, the psychological suffering of Breckeen and his children from the arrest and subsequent prosecution. She advised that Breckeen was consistently seeking employment following his arrest but faced significant difficulties because of the outstanding charges. Williams attested that Breckeen had been gainfully employed for much of his adult life. She mentioned four trips from San Antonio, Texas to Evangeline Parish for trial matters that were postponed by the EPDA's office without notice and that caused the family extra expense. Williams testified that she hired attorneys in Waxahachie and Lafayette to defend her son from the prosecution and was required to empty her retirement accounts to do so. According to Williams, the EPSO could not explain why the arrest warrant was originally issued for her son resulting in his prolonged detention in an Ellis County, Texas jail.

### e. Christopher Breckeen ("Breckeen")

Breckeen testified regarding the events of August 9-10, his whereabouts, and the mental anguish suffered as a result of his wrongful arrest. Most of Breckeen's testimony is encapsulated

in prior witness testimony and does not necessitate repeating. In short, Breckeen was wrongfully arrested, he spent 11 days in jail, he was uninformed about why he was spending those 11 days in jail, and he has suffered indeterminate reputational harm.

## II.     FINDINGS OF FACT

### 1.   The Jordan Affidavit was materially misleading.

The affidavit for arrest warrant signed by Deputy Sheriff for Evangeline Parish Duane Jordan contains multiple misrepresentations.

After describing the events of the morning of August 10, 2015, the Affidavit states:

> Evangeline Parish Sheriff's Office Investigators and Deputies were dispatched out for assistance and ultimately assisted in the overall investigation of the case, before Mamou Police Department eventually turned over the entire case to the Evangeline Parish Sheriff's Office.

This statement is followed by language indicating that EPSO was directly involved in the underlying investigation and that Jordan had direct knowledge of the investigation. The Affidavit states:

> During the investigations and receipt of witness statements, it was learned that a John Deer [sic] rubber tire backhoe was seen driven on the night of August 10, 2015 by a white male subject fitting the description of a known suspect in this case by the name of Christopher Breckeen, He was brought in for questioning.

This is false in multiple ways. Breckeen was brought in for questioning on August 10, 2015. The statement describing a person on a backhoe the morning of August 10, 2015 was not received until August 12, 2015 and was received by Mamou PD, not EPSO. This is after Breckeen had been brought in for questioning. Further the witness statement does not describe a subject fitting the description of Breckeen. Breckeen is a bald, white, male approximately 6'0" in height and between 195 lbs. to 210 lbs. The description given of the person on the backhoe was that the driver "appeared to be a white male, medium built … wearing a cap on his head" and the witness

could not see the backhoe driver's face. The only characteristics shared between Breckeen and the witness statement is skin color and gender, which is insufficient to say Breckeen fit the witness's description.

The Affidavit immediately follows this statement with another misrepresentation claiming:

> After further investigations, it was learned that a John Deer [sic] backhoe belonging to Coastal Bridge Company out of Baton Rouge, LA had been stolen. The backhoe was equipped with a GPS tracking device, in which the logs indicated that the stolen backhoe was stopped at Breckeen's residence of 2282 Deculus Road Mamou, LA for a period of time.

This statement indicates that the temporary location of the backhoe was discovered "after further investigations" – i.e. after Breckeen had first been identified as a suspect and interviewed. In fact, the GPS information was obtained the morning of August 10, 2015. An officer was dispatched to the Deculus Property where it was discovered to be unoccupied. This information precipitated the detention of Breckeen early in the afternoon on August 10, 2015. This context is particularly relevant given the intentional omissions contained in the Affidavit. Further, the Affidavit indicates that the Deculus Property was Breckeen's "residence" – i.e. that he resided there. The Supplemental Report upon which Jordan based his affidavit made clear that multiple individuals gave statements establishing that Breckeen had not resided at the Deculus Property for over a month.

The Affidavit omits highly relevant information including that two witnesses were interviewed who stated that Breckeen was at the Hickory House the entire night of August 9, 2015 and morning of August 10, 2015. There was a potential third witness who could have also corroborated Breckeen's whereabouts at that time, but investigators did not take their statement. A fourth witness corroborated that the Deculus Property address was unoccupied and that Breckeen was living at the Hickory House at all relevant times.

**2.  Deputy Sheriff Jordan acted with reckless disregard for the truth in signing the false arrest warrant.**

As discussed above, the Affidavit contains numerous material misrepresentations and omissions that could have easily been corrected or avoided had Jordan read the Mamou PD Supplemental Report. Each of the pertinent facts omitted were contained within the Supplemental Report. The accurate order of investigatory facts is explicitly described in the Supplemental Report. The Supplemental Report itself is only eight pages long. According to the pre-trial stipulations, Jordan took no part in the investigation and based his affidavit on the reports and evidence of other agencies. The reports and evidence of other agencies directly contradict Jordan's affidavit. There is no evidence in the record to explain why the Affidavit so gravely misrepresents the contents of the Supplemental Report and Jordan did not testify as to why his affidavit was grossly misleading.

**3.  Probable cause did not exist for the issuance of the Arrest Warrant.**

The Affidavit presented the sum-total of evidence against Breckeen in a misleading and deceptive manner. This evidence is that one of the suspects was a white male. This white male was wearing all black at the scene of the Heist. Another, potentially white male, who may or may not have been wearing all black, was seen approximately two hours before the Heist driving a backhoe into town. This potentially white male was wearing a baseball cap and was of medium build. Nobody saw this suspect's face. The backhoe used in the Heist stopped for an undisclosed period of time at a vacant property Breckeen had owned.

The evidence that was not disclosed in the Affidavit is that Breckeen is not of medium build, he has two witnesses that vouched for his whereabouts during the Heist, he has a third witness that could have vouched for his whereabouts during the heist but was never interviewed,

he has two witnesses that can account for why and how long he had not been living at the Deculus Property.

Presented accurately, it is not plausible that a warrant would have issued because the facts are well-nigh insufficient to find probable cause.

**4. Christopher Breckeen suffered financial harm from his wrongful arrest.**

Breckeen was unemployed on August 10, 2015 when the ATM was stolen. According to the Booking Card, he was employed as a coach at the time of his arrest on February 19, 2016.  He was required to post a $23,000 bond to secure his release from jail, which he did through a bail bondsman. Breckeen hired a lawyer to secure his release from a Texas jail. Breckeen hired a second lawyer to defend himself against the meritless charges brought against him. Breckeen was required to travel from San Antonio to Mamou to contest these meritless charges on at least four separate occasions.

Although Breckeen, his mother, and son testified that he had difficulty finding employment as a result of his felony arrest, there is no direct evidence of his failing to obtain a job or having been terminated from a job as a result of his felony arrest and incarceration. Further, there is no evidence, direct or testimonial of the degree of financial impact or any lost earnings opportunities in the record.

**5. Christopher Breckeen suffered mental anguish and emotional distress from his wrongful arrest.**

Breckeen was wrongfully detained in jail for approximately eleven (11) days. His testimony, as well as that of his eldest son, Landry, and his mother, Williams, describe his distressed mental state dealing with both the experience of being imprisoned for eleven days, the prospect of future imprisonment, and contesting the meritless charges brought against him. Williams described Breckeen as scared when he was released from Ellis County Jail and stated

that he broke down on the drive home. She further testified that the experience has been devastating to Breckeen and his family. Further, Breckeen's minor children have suffered significant psychological stress which has carried over to Breckeen as a result of the wrongful arrest. Breckeen and his children were forced to move in with his parents due to the financial and mental strains caused by the wrongful arrest.

6. **Christopher Breckeen did not suffer any physical injuries stemming from his wrongful arrest.**

Breckeen testified that although his time in Ellis County Jail was a frightening period, he did not suffer any physical harm from his confinement. He did not testify regarding whether he suffered any physical harm at the time of his arrest. He testified that he did not suffer any mistreatment from the EPSO when he turned himself in after being released from Ellis County Jail.

7. **This Court takes Judicial Notice of the Settlement Agreement entered into between the United States Department of Justice and the Evangeline Parish Sheriff's Office on June 4, 2018.**

On June 4, 2018, the EPSO and the United States Department of Justice ("DOJ") entered into a settlement agreement ("Settlement Agreement") following a DOJ investigation into alleged Fourth Amendment violations committed by EPSO. The Settlement Agreement specifically states that the DOJ "determined that systemic deficiencies contribute to these patterns or practices, including deficiencies in EPSO's policies, training, interrogation practices, community policing practices, supervision, data collection, and transparency."

The Settlement Agreement requires:

- "Once an affidavit of probable cause has been filled out, EPSO will ensure that it is immediately reviewed by a supervisor."

- "Once approved by a supervisor, EPSO will ensure that the affidavit is immediately transmitted to a judge or magistrate for review."

- "EPSO will ensure that its officers receive basic training and certification prior to commencing work, as well as ongoing in-service and remedial training in order to ensure that officers are aware of their Fourth Amendment obligations and all policies incorporating the terms of this Agreement."

- "No EPSO employee, whether full-time or part-time, will be allowed to perform the full duties of a law enforcement officer until they have successfully completed all requirements for POST certification under state law, including training requirements."

## III.    CONCLUSIONS OF LAW

### A.  Federal Claims Under 42 U.S.C. § 1983

Section 1983 authorizes the assertion of a claim for a relief against a person who, acting under color of state law, violated the claimant's federally protected rights. 42 U.S.C. § 1983. In order to prevail in a civil rights action under Section 1983, the claimant must prove by a preponderance of the evidence that the conduct of the defendants was under the color of state law and that the conduct resulted in a deprivation of rights, privileges, or immunities secured by the United States Constitution or a federal statute or both. West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); Petersen v. Johnson, 57 F.4th 225, 231 (5th Cir. 2023); Paddio v. City of Hammond, CIVIL ACTION NO. 97-343 SECTION: E/2, 1997 U.S. Dist. LEXIS 7565, at *8 (E.D. La. May 27, 1997).

This Court must determine whether Breckeen has sufficiently alleged the violation of a right secured by the Constitution or federal law. Breckeen alleges that EPSO Deputy Sheriff Duane Jordan and the EPSO violated his Fourth Amendment rights to be free from false arrest, be subjected to abuse of process, and free from malicious prosecution. Breckeen further asserts claims for *Monell* liability against Eddie Soileau and the EPSO. Specifically, Breckeen alleges that Jordan falsified an affidavit to secure an arrest warrant and his subsequent wrongful prosecution. He asserts that the standards, practices, lack of training, and lack of supervision of then EPSO Sheriff

Eddie Soileau permitted Deputy Sheriff Jordan to falsify the Affidavit signed. First, we will examine the exception to the independent intermediary doctrine, then we will examine each of these claims on their own.

## B. The <u>Franks</u> Exception to the Independent Intermediary Doctrine

A "constitutional claim of false arrest requires a showing of no probable cause." <u>Hughes v. Garcia</u>, 100 F.4th 611, 619 (5th Cir. 2024) (quoting <u>Club Retro, LLC v. Hilton</u>, 568 F.3d 181, 204 (5th Cir. 2009)). Similarly, the essence of a "Fourth Amendment claim for malicious prosecution…is the wrongful initiation of charges without probable cause." <u>Hughes</u>, 100 F.4th at 619 (quoting <u>Thompson v. Clark</u>, 596 U.S. 36, 43, 142 S. Ct. 1332, 212 L. Ed. 2d 382 (2022)). "Probable cause in turn requires a probability or substantial chance of criminal activity, not an actual showing of such activity." <u>Hughes</u>, 100 F.4th at 619 (citing <u>Winfrey v. Rogers</u>, 901 F.3d 483, 495 (5th Cir. 2018)) (internal quotations omitted). The existence of probable cause depends on whether an objectively reasonable police officer would believe the suspect had committed a crime. See <u>Terwilliger v. Reyna</u>, 4 F.4th 270, 282 (5th Cir. 2021).

The independent intermediary doctrine protects officers who make honest mistakes in sworn statements used to procure a search warrant. <u>Villarreal v. City of Laredo</u>, 94 F.4th 374, 393 (5th Cir. 2024) (en banc). This protection does not hold true, however, "where a warrant affidavit (1) contains false statements or material omissions (2) made with at least reckless disregard for the truth that (3) were necessary to the finding of probable cause." <u>Hughes</u>, 100 F.4th at 619 (quoting <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676 (1978)) (internal quotations omitted). If these three elements are met, the Court must then perform a "corrected affidavit analysis" to determine whether the warrant affidavit would have supported probable cause if the

misstatements and material omissions were eliminated. Hughes, 100 F.4th at 620 (citing Terwilliger, 4 F.4th at 283).

The Fifth Circuit recently considered a case analogous to this one in Hughes v. Garcia, 100 F.4th 611 (5th Cir. 2024). In Hughes, the plaintiff reported a drunk driver to 911 and when the drunk driver attempted to flee across the middle of the highway, the plaintiff restrained him until the police could arrive. Id. at 615. For unfathomable reasons, the police took the word of the obviously drunk driver and accused the plaintiff of impersonating a police officer. Id. at 616. Officers then signed a probable cause affidavit that contained a myriad of false and misleading statements and omissions. Id. at 617. The warrant issued, the plaintiff was arrested and charged. Id. The plaintiff was forced to spend thousands of dollars defending himself from the frivolous charges before they were ultimately dropped. Id. at 614. The plaintiff then filed a Section 1983 action against the officers who signed the false probable cause affidavit for violating "his Fourth and Fourteenth Amendment rights to be free from unlawful arrest and malicious prosecution by filing a false report or by knowingly standing by while the other officer did so." Id. at 618. The two officers moved to dismiss the complaint asserting qualified immunity. Id. The district court denied the officers' motions and the Fifth Circuit upheld that denial.

Here, Defendants Duane Jordan and Eddie Soileau have suggested that they are immune from liability because either the magistrate judge who issued the warrant or the EPDA that filed the bill of information somehow breaks the chain of liability against them for the false arrest affidavit. The Fifth Circuit has made clear that neither event breaks the chain of liability for an officer who seeks issuance of an arrest affidavit that (1) contains false statements or material omissions (2) made with at least "reckless disregard for the truth" that (3) were "necessary to the finding of probable cause and (4) cannot be cured by a corrected affidavit analysis.

As discussed in the Court's Findings of Fact, the Affidavit contained false statements and omissions that could have easily been avoided by accurately describing the contents of the 8-page Mamou PD Supplemental Report, and these false statements and omissions were necessary to the finding of probable cause. Likewise, as discussed in the Court's Findings of Fact, probable cause could not be found if these false statements or omissions were removed or accurately reported. Thus, Breckeen's claims for false imprisonment and malicious prosecution are not barred or limited by the independent intermediary doctrine or the actions of the magistrate judge in issuing the warrant or the EPDA in pursuing charges against him.

### 1.  Breckeen's Fourth Amendment claims for false arrest.

The threshold for a false arrest is a particularly low one – it requires a mere touching under color of law where there is no probable cause for the touching. See Torres v. Madrid, 592 U.S. 306, 320, 141 S. Ct. 989, 1000 (2021) ("Stated generally, false imprisonment required 'confinement,' such as 'taking a person into custody under an asserted legal authority.' But that element of confinement demanded no more than that the defendant 'had for one moment taken possession of the plaintiff's person'—including, 'for example, if he had tapped her on the shoulder, and said, 'You are my prisoner.'") (internal citations omitted). Though the standard is low for establishing liability, there is a reciprocal limit on the amount of damages one can recover commensurate with the degree of "touching". See Wallace v. Kato, 549 U.S. 384, 390, 127 S. Ct. 1091, 1096 (2007). Damages are limited to the period of the false arrest. Id. ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself.") (emphasis in original).

Breckeen's claims under the Fourth Amendment to be free from false arrest are simple and clear. EPSO Deputy Sheriff Jordan falsified an affidavit for an arrest warrant. As discussed *supra*, the Affidavit contained multiple misrepresentations and highly pertinent omissions. These misrepresentations and omissions could have easily been avoided by reading the eight-page Mamou PD Supplemental Report. According to the pre-trial stipulations, Deputy Jordan did not participate in the investigation and based his affidavit upon reports and evidence prepared by other agencies. His affidavit, however, clearly misrepresents the reports and evidence prepared by those other agencies. The pre-trial stipulations further claim that Jordan "only came in when the Affidavit of Arrest Warrant was ready to be signed." That is, he performed no due diligence prior to signing the affidavit for Breckeen's arrest. His voluntary absence from the trial of this case is but another example of his "ho hum" approach throughout.

Deputy Sheriff Jordan signed the false affidavit and did so under color of state law. As a result, Breckeen was arrested, spent 11 days in a Texas County jail, was required to post a $23,000 bond, forced to travel back to Evangeline Parish to turn himself over to the Evangeline Parish Sheriff's office, obtain multiple attorneys, and ultimately defend himself against frivolous charges. The bill of information formally charging him was not issued until December 20, 2017. Jordan violated Breckeen's Fourth Amendment right to be free from false arrest.

Evangeline Parish Sheriff Eddie Soileau, on the other hand may not be held liable under Section 1983 absent a showing of some wrongful behavior on his part. Guillot v. Russell, 59 F.4th 743, 751 (5th Cir. 2023) ("Section 1983 does not allow recovery under a theory of *respondeat superior*; a plaintiff must show that the local government's policy or custom violated the plaintiff's constitutional rights."). Official-capacity suits may be brought only against an official acting as a policymaker, such that his decisions represent the official policy of the local government unit. Id.

at 750 (citing <u>Jett v. Dall. Indep. Sch. Dist.</u>, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)). In Louisiana, the sheriff is the final policymaker for the sheriff's department. <u>See</u> La. Const. art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish."); <u>see also</u> La. Stat. § 13:5539 ("Each sheriff . . . shall preserve the peace and apprehend public offenders."); <u>Guillot</u>, 59 F.4th at 750-51 ("In Louisiana, the sheriff is the final policymaker.").

The record contains evidence that Sheriff Soileau failed to adequately supervise and train his department. First, the initial signing of the false affidavit by Deputy Sheriff Jordan suggests a lack of supervision by the department. Second, the testimonial evidence of Williams that EPSO was unable to tell her why Breckeen had been arrested despite multiple attempts daily for nearly eleven days. Third, Breckeen was released on an extradition bond from Ellis County Jail instead of being transferred to EPSO. Finally, the settlement agreement entered into between the DOJ and EPSO evidences a significant lack of oversight and training generally. The defense has not offered any evidence or testimony to controvert the weight of the evidence put on by Breckeen. We conclude that Sheriff Soileau is personally liable for the false arrest of Christopher Breckeen pursuant to the falsified affidavit of arrest submitted by Deputy Sheriff Jordan under the standards enunciated above. This conclusion is based on the finding that Sheriff Soileau failed to adequately supervise and train the members of his department, created a policy or custom which tolerated unconstitutional practices, and was deliberately indifferent in managing his subordinates.

### 2. Breckeen's Fourth Amendment claims for malicious prosecution.

Fifth Circuit jurisprudence on claims for malicious prosecution is muddled. In 2003, this Circuit held that "no such freestanding right to be free from malicious prosecution exists." <u>Castellano v. Fragozo</u>, 352 F.3d 939, 945 (5th Cir. 2003). It elaborated that it was not eliminating liability for the actions, but rather altering the nomenclature for the prohibited conduct:

> The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection -- the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983. Regardless, they are not claims for malicious prosecution and labeling them as such only invites confusion.
> Castellano v. Fragozo, 352 F.3d 939, 953-54 (5th Cir. 2003)

Castellano did not so much as eliminate Section 1983 claims for wrongful prosecution as it relabeled them Section 1983 claims for denial of due process. Id. at 942 ("We hold that a state's manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause....").

Courts in the Fifth Circuit struggled to consistently interpret the holding in Castellano, with some strictly adhering to the language that "no such freestanding right to be free from malicious prosecution exists" with others recognizing that although "malicious prosecution" may not be actionable, claims for due process violations effectively identical to "malicious prosecution" were. Compare Danna v. Purgerson, 760 F. App'x 275, 279 (5th Cir. 2019) (holding that the omission of exculpatory evidence from an affidavit filed after she was detained for prosecution purposes was not a violation of § 1983 for malicious prosecution or any analogue because it did not result in a separate deprivation of a federally protected right); and Porter v. Lear, 751 F. App'x 422, 432 (5th Cir. 2018) (holding that the suppression of exculpatory evidence was not a deprivation of the due process of law); and Travis v. City of Grand Prairie, 654 F. App'x 161, 164 (5th Cir. 2016) (holding that police fabrication of evidence in order to induce a prosecutor to believe probable cause existed for an arrest was not actionable as a malicious prosecution and failing to address due process concerns relating to the fabrication of evidence); with Winfrey, 901 F.3d at 492-93, 495 (5th Cir. 2018) (holding that the plaintiff had presented a cognizable Fourth Amendment claim because he

was arrested pursuant to a warrant whose affidavit did not establish probable cause, and the criminal proceedings ended in his favor); and Whittington v. Maxwell, 455 F. App'x 450, 457 (5th Cir. 2011) (holding that a claim for wrongful prosecution was not "freestanding" because plaintiff suffered a false arrest and seizure in violation of the Fourth Amendment).

The U.S. Supreme Court recently put to bed the theory that Section 1983 does not support a freestanding malicious prosecution claim in Thompson, 596 U.S. at 43, 142 S. Ct. at 1337-38 ("[T]he gravamen of the Fourth Amendment claim for malicious prosecution, as this Court has recognized it, is the wrongful initiation of charges without probable cause. And the wrongful initiation of charges without probable cause is likewise the gravamen of the tort of malicious prosecution."). The Supreme Court set forth three necessary elements of a Fourth Amendment malicious prosecution claim – "(i) the suit or proceeding was 'instituted without any probable cause'; (ii) the 'motive in instituting' the suit 'was malicious,' which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution 'terminated in the acquittal or discharge of the accused.'" Id., 596 U.S. at 44, 142 S. Ct. at 1338.

The Fifth Circuit has held that Thompson is not the final word. With the Fourth Amendment tort of malicious prosecution firmly reinstated, the Fifth Circuit has elected to reinstate its pre-Castellano jurisprudence regarding the necessary elements for a malicious prosecution claim. See Armstrong v. Ashley, 60 F.4th 262, 279 (5th Cir. 2023) ("The Supreme Court did not, however, lay out a comprehensive list of the elements for a Fourth Amendment malicious prosecution claim, and largely left the question of elements to the lower courts."). These elements are "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide

termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." Gordy v. Burns, 294 F.3d 722, 725 (5th Cir. 2002). Elements (1)-(4) and (6) are self-explanatory. The Fifth Circuit has established that "[i]n a malicious prosecution action, malice exists when a charge is made with knowledge that it is false or with reckless disregard for the truth." Phillips v. L. Brands Serv. Co., L.L.C., 82 F.4th 291, 302 (5th Cir. 2023); see also Kelly v. W. Cash & Carry Bldg. Materials Store, 99-0102 (La. App. 4 Cir 10/20/99), 745 So. 2d 743, 761 ("Malice may be inferred from the lack of probable cause or inferred from a finding that the defendant acted in reckless disregard of the other person's rights.").

The second deviation from Thompson is a question of whether it applies retroactively to conduct occurring before the decision. The Fifth Circuit has not yet made up its mind ruling both that Fourth Amendment claims for wrongful prosecution only apply to conduct occurring after the Thompson decision and that wrongful conduct claims may be sustained for conduct that occurred prior to the Thompson decision. Compare Armstrong, 60 F.4th at 267 ("The district court correctly dismissed nearly all of the claims, including a constitutional malicious prosecution claim, which, at the time suit was filed, was not cognizable in the Fifth Circuit."; Espinal v. City of Hous., 96 F.4th 741, 749 (5th Cir. 2024) (holding that officers could not have engaged in malicious prosecution in 2020); with Hughes, 100 F.4th at 625 (denying qualified immunity and allowing a wrongful prosecution claim for conduct occurring before Thompson to proceed); and Bledsoe v. Willis, No. 23-30238, 2023 U.S. App. LEXIS 31326, at *17 (5th Cir. Nov. 27, 2023) ("Although this court did not recognize a 'freestanding constitutional right to be free from malicious prosecution' at the time of Willis's and McClure's investigation, we must recognize that 'the initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested,'")

(quoting <u>Winfrey</u>, 901 F.3d at 491 and <u>Castellano</u>, 352 F.3d at 953); <u>see also</u> <u>Vela v. Lewis</u>, No. 4:23-CV-03376, 2024 U.S. Dist. LEXIS 39899, at *12 (S.D. Tex. Mar. 6, 2024) ("The Court need not wade into the issue of malicious prosecution, as Vela brings a falsification-of-evidence claim, not a malicious prosecution claim. These two claims are not identical, with each involving distinct elements.").

This background is pertinent because in order to overcome an officers' qualified immunity, Breckeen must "(1) allege facts that 'make out a violation of a constitutional right,' and (2) show that the 'right at issue was 'clearly established' at the time of the defendant[s'] alleged misconduct.'" <u>Espinal</u>, 96 F.4th at 748 (quoting <u>Jennings v. Patton</u>, 644 F.3d 297, 300 (5th Cir. 2011)). "Qualified immunity protects public officials from civil liability when they lack notice that their conduct is unlawful." <u>Matthews v. Green</u>, No. 23-10178, 2024 U.S. App. LEXIS 2732, at *5-6 (5th Cir. Feb. 6, 2024) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).

In the present matter, Breckeen, a *pro se* plaintiff, has satisfied both the pre-<u>Thompson</u> requirements for a Fourth Amendment claim for a violation of the due process clause as well as the post-<u>Armstrong</u> six elements of a wrongful prosecution claim.

Jordan violated Breckeen's Fourth Amendment right to due process by providing a false and intentionally misleading affidavit that resulted in a false imprisonment and seizure. Breckeen's pre-<u>Thompson</u> claim for wrongful prosecution is not "freestanding" because it is tethered to his false arrest and seizure in violation of the Fourth Amendment.

We reach the same result under the <u>Armstorng</u>/<u>Gordy</u> wrongful prosecution elements. (1) a criminal proceeding was commenced against Breckeen; (2) the criminal proceedings against Breckeen were legally caused by Jordan signing the false affidavit; (3) the criminal proceedings

against Breckeen were dismissed; (4) no probable cause existed for the criminal proceedings against Breckeen; (5) malice is present because Jordan demonstrated a reckless disregard for the truth in falsifying the affidavit; and (6) Breckeen suffered damages as a result.

### 3. Breckeen's Fourth Amendment claims for abuse of process.

The Fifth Circuit does not recognize a constitutional claim for "abuse of process." Morgan v. Chapman, 969 F.3d 238, 241 (5th Cir. 2020) ("We reverse because malicious prosecution and abuse of process are not viable theories of constitutional injury."). It is not necessary to determine whether Thompson altered the availability of abuse of process in the Fifth Circuit because Breckeen's claims would fail under the prior abuse of process standard. Assuming, arguendo, that Thompson has resurrected the viability of abuse of process claims, the two essential elements to sustain such a claim are "(1) the existence of an ulterior purpose; and (2) a wilful act in the use of the process not in the regular prosecution of the proceeding." Duboue v. City of New Orleans, 909 F.2d 129, 132 (5th Cir. 1990). An abuse of process occurs when "the actor employs legal process in a manner technically correct, but for a wrongful and malicious purpose to obtain an unjustifiable end or an object which it was not the purpose of the particular process employed to effect." Hebert v. La. Licensed Prof'l Vocational Rehab. Counselors, 07-610 (La. App. 3 Cir. 3/4/09), 4 So. 3d 1002, 1009 (citation and quotations omitted).

"The first element, that of ulterior purpose, is similar to the concept of 'malice,' but is a much more demanding test which would not be met by a showing of lack of knowledge or other technical types of malice, but which is only met when the officer is acting for a specific purpose not authorized by law." Taylor v. State, 617 So. 2d 1198, 1205 (La. App. 3 Cir. 1993). "The second criteria, improper use of process, refers to a failure to comply with the proper procedures or rules

set out by law for conducting official actions." Id. Breckeen, therefore, must show that there was malice plus improper use of process.

Breckeen asserts two separate theories of liability for abuse of process. First, Breckeen asserts that the affidavit of arrest was issued the same day that his wife granted him custody of their children. Second, that his subsequent prosecution was intended to cover up the bad acts of the EPSO. Under neither theory does Breckeen produce sufficient evidence to find in his favor.

Breckeen's first theory goes that the affidavit for arrest and subsequent arrest warrant were issued in retaliation for his receiving custody of his children and taking them to San Antonio, Texas. According to his then wife, Brezina, she had gotten into a heated exchange with her immediate family members on February 18, 2016, and was afraid that they were going to attempt to have her mentally committed. In this fight she exclaimed that she was granting guardianship to Breckeen who would take the three children to San Antonio, Texas and her Mamou family would never see the children again. Brezina claims that her family had relationships with local law enforcement that influenced the false Affidavit but fails to elaborate how. Breckeen contends that the timing between Brezina's argument and threats, when Brezina signed the guardianship agreement authorizing Breckeen to take the children to San Antonio (February 19, 2016), and when the false affidavit for arrest was signed (February 19, 2016) is too coincidental to be unrelated.

The defense did not cross-examine either Brezina or Breckeen regarding the dispute and threats made on February 18, 2016, the custody agreement, or the timing of the false affidavit for arrest. Nonetheless, this Court is not persuaded that these coincidences are sufficient to establish by a preponderance of the evidence that the false affidavit was related to the custody agreement or dispute between Brezina and her family. Brezina could not specify the nature of the relationship between the alleged friends of her Mamou family with members of law enforcement or their

connection with Deputy Jordan. Breckeen fails to establish an ulterior purpose for the issuance of the false affidavit.

Breckeen's second theory is that the charges brought against him by the EPDA's Office were made to insulate the EPSO from their prior bad acts. However, Breckeen misstates who was responsible for charging him (other than as discussed above). As discussed *supra*, an official capacity suit may only be brought against an official acting as a policymaker such that his decisions represent the official policy of the local governmental unit. Guillot, 59 F.4th at 750. Neither Sheriff Soileau nor the EPSO make decisions on who and who is not charged with a crime. Rather, that responsibility falls to the district attorney. See La. R.S. § 16:1 (The district attorneys throughout the state of [sic] their designated assistants… shall have charge of every criminal prosecution by the state in his district.").

Although Breckeen would not likely have been subjected to prosecution by the district attorney's office but for the false affidavit, the sheriff's office is not the party that abused process in this manner. The filing of the bill of information charging Breckeen was done by the district attorney in the district attorney's official capacity. The district attorney is not a defendant in this matter. Even assuming, *arguendo*, that the sheriff's office could meet the requirements for an abuse of process claim relating to the filing of charges against Breckeen, Breckeen fails to establish by a preponderance of the evidence an ulterior motive. Rather, Breckeen relies on his own opinion testimony about these ulterior motives and asks the Court to take a major logical leap. This the Court cannot do.

### 4. Breckeen's Monell Liability Claims

In order to ensure that a local government is not subject to liability merely because it employs a tortfeasor, governmental liability under Section 1983 requires proof of three elements.

Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). First, there must be an official policymaker "with actual or constructive knowledge of the constitutional violation." Zarnow v. City of Wichita Falls, 614 F.3d 161, 167 (5th Cir. 2010). Second, there must be an "official policy." Id. at 166. Such policy may either be a formally announced policy statement, ordinance, or regulation, or it may be a custom that is "a persistent, widespread practice of City officials of employees." Piotrowski, 237 F.3d at 579 (quoting Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984)). Third, there must be "a violation of constitutional rights whose moving force is the policy or custom." Id. at 578; Zarnow, 614 F.3d at 166. In short, "[m]unicipal liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation." Zarnow, 614 F.3d at 167.

As discussed above, EPSO Sheriff Soileau failed to maintain appropriate controls over his department. Sheriff Soileau elected not to appear or testify in his defense. The evidence before the Court is sufficient to find that EPSO's lax oversight established a custom that was a persistent and widespread practice.   Accordingly, we find that EPSO is liable for the damages suffered by Breckeen.

## IV.   DAMAGES

Breckeen prays for damages for unlawful arrest, pain and suffering, mental anguish, attorney's fees, and punitive damages. Breckeen no doubt suffered actual damages from his unlawful arrest. However, Breckeen failed to introduce into evidence or testify regarding the quantum of his economic damages. He had to travel from Texas to Mamou and stay at a hotel four times. He posted a $23,000 bond for his release from jail in Texas. He hired multiple attorneys to secure his release and dismissal of charges, but it is unclear how much these attorneys were paid. In short, Breckeen failed to introduce evidence of his economic damages.

Breckeen also suffered non-economic damages. He was wrongfully jailed for eleven days. He, his mother, and his eldest son all testified that he had suffered emotional distress arising from his wrongful arrest.

Having considered awards for wrongful arrest in the district, given the circumstances of Breckeen's arrest, the wrongful conduct of Jordan, and the practices of EPSO under Sheriff Soileau's stewardship, this Court issues an omnibus award of $40,000 to Christopher Breckeen. Defendants, Duane Jordan and Eddie Soileau, in their personal and professional capacity are liable jointly and in solidido for this award.

A judgment incorporating this award will follow.

THUS DONE AND SIGNED at Alexandria, Louisiana this ⎯5⎯ day of August 2024.


DEE D. DRELL, SENIOR JUDGE
UNITED STATES DISTRICT COURT